Tyler B. Ayres, Bar No. 9200
AYRES LAW FIRM
12339 S. 800 E. Ste. 101
Draper UT 84020
(801) 255-5555 Phone
(801) 255-5588 Fax

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RYAN PYLE,<br><br>      Plaintiff,<br><br>vs.<br><br>JAMES WOODS, an individual, KELVYN CULLIMORE, an individual, COTTONWOOD HEIGHTS, a governmental entity, and JOHN AND JANE DOES 1-10<br><br>      Defendants | **PLAINTIFF'S OPPOSITION MEMORANDA TO DEFENDANTS MOTION TO DISMISS**<br><br>Case No. 2-15-CV-00143-TC<br><br> Judge: Tena Campbell |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS JAMES WOODS, KELVYN CULLIMORES AND COTTONWOOD HEIGHTS MOTION FOR DISMISSAL**

### INTRODUCTION

Defendants have asked this court to dismiss Plaintiff's complaint pursuant to Rule 12(b)(6). The issue presented for this court is whether or not Utah Code § 58-37f-201, that provided law enforcement access to the Utah Controlled Substance Database ("UCSD"), was subject to other laws including the U.S. Constitution, the Utah Constitution, Utah Code § 63G-2-202 (access to private documents), the Fair Credit Reporting Act ("FCRA"), 15 U.S.C.A. § 1681 et seq., and the Health Insurance Portability and Accountability Act, Privacy Rule, 45 C.F.R. § 164.512 (commonly referred to as

HIPAA).

We live in the information age. There is quick and easy access to vast amounts of information, much of it deeply personal and sensitive. The ease of access dictates a need for greater vigilance since the practical protections are diminished. See *United States v. Jones*, 132 S. Ct. 945, 963–64 (2012) (Alito, J., concurring in judgment) ("In the pre-computer age, the greatest protections of privacy were neither constitutional nor statutory, but practical. . . . Only an investigation of unusual importance could have justified such an expenditure of law enforcement resources.")

Defendants' position is essentially that they (the government) have access to the database and that access is not limited by state or federal constitutions (or any other laws). Defendants mistakenly believe accessibility and convenience eliminates constitutional protections against unreasonable searches and seizures.

Plaintiff's position is that the Utah Legislature never intended to supersede—and in fact could not have superseded—the U.S. Constitution, Utah Constitution, or any other other federal law by enacting Utah Code § 58-37f-201. This was a warrantless search. Warrantless searches as per se unreasonable - "'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *City of Los Angeles v. Patel*, ___ S. Ct. ___, 2015 WL 2473445, at *7 (June 22, 2015) (quoting *Gant*, 556 U.S. 332, 338 (2009). The mere fact that law enforcement and prosecutorial personnel had the technical ability to easily access the UCSD does not change that its use must be consistent with state and federal constitutions and other applicable laws. Ease of access does not create a right to access.

## BACKGROUND

### I.    The Utah Controlled Substance Database.

The Utah Controlled Substance Database ("UCSD") is an electronic database maintained by a Utah agency that stores information about "every prescription for a controlled substance dispensed in the state to any individual other than an inpatient in a licensed health care facility." Utah Code Ann. § 58-37f-201(5).  It meets the definition of a consumer report under the FCRA. Com., ¶ 45.

Utah pharmacists are required to electronically report to the UCSD for any "controlled substance" drug [1]:

>    (i) the name, address, date of birth, gender, and ID number of the patient;
>    (ii) the pharmacy and pharmacist dispensing the controlled drug;
>    (iii) the practitioner who prescribed the drug;
>    (iv) the name and Rx number of the drug prescribed, date the prescription was issued and filled, quantity, strength, and dosage of the drug; and
>    (v) the number of days' supply dispensed and refills authorized.

Utah Code § 58-37f-203(2); Utah Admin. Code R. 156-37f-203(1)(a).

The individual prescription information in the UCSD reveals a great deal because many medications are only prescribed for specific symptoms associated with a single disease or syndrome.  A patient's prescription history can reveal a physician's confidential medical advice, including treatment, diagnosis, and the stage or severity of the disorder or disease.  Controlled substances, the prescriptions for which are tracked in the UCSD, include commonly prescribed medications such as Xanax, Tylenol with codeine, testosterone, Ambien, and Ritalin.  The prescription information can reveal

---

[1] For purposes of the UCSD, "controlled substances" consist of all drugs under the Controlled Substances Act, 21 U.S.C. § 812, and under the Utah Controlled Substances Act, Utah Code Ann. §§ 58-37-4, 58-37-4.2 and 58-37-3.

that a patient suffers from anxiety disorders, chronic pain, insomnia, AIDS, or ADHD, among numerous other sensitive facts about health and treatment.

The Utah legislature recognized the sensitivity of these records. It is a felony to obtain or release information from the database without authorization. Utah Code Ann. § 58-37f-601. Access to the database by physicians, pharmacists, mental health therapists, dentists, and other health care providers is closely monitored. There are severe penalties for abuses. *Id.*

Notwithstanding that the information is sensitive and private, until this year direct access was given to law enforcement agents and prosecutors if they were:

> engaged as a specified duty of their employment in enforcing laws: (i) regulating controlled substances; (ii) investigating insurance fraud , Medicaid fraud, or Medicare fraud; or (iii) providing information about a criminal defendant to defense counsel, upon request during the discovery process.

*Id.* § 58-37f-301(2)(i) (2014) (amended by 2015 Utah Laws Ch. 326).

There was no specific provision requiring a showing of individualized suspicion or legal process for access. In recognition of the sensitivity of the medical information contained in the UCSD and facts relating to abuses, the Utah legislature recently amended the statute to make clear law enforcement access required "a valid search warrant." 2015 Utah Laws Ch. 326 § 2 (codified at Utah Code Ann. § 58-37f-301(2)(k)).

The UCSD is also governed by the U.S. Constitution, Utah Constitution, HIPAA, Utah's statutory limits and the FCRA. See Complaint at ¶¶ 16-18, 20, 22. Hence, there were no meaningful restrictions on access to the database from Utah Code Ann. § 58-37f-301 . Com., ¶ 51.

## II.   FACTS REGARDING PLAINTIFF AND HIS EMPLOYER – UNIFIED FIRE AUTHORITY FOR SALT LAKE COUNTY ("UFA") [2]

Ryan Pyle ("Pyle") was and is employed by Unified Fire Authority (UFA) at all times relevant to this matter. He is a paramedic on an ambulance. Com., ¶ 30. Pyle was assigned to Departments 101 and 107. Id. at ¶ 57.

In late April of 2013, UFA fire crews discovered morphine had been removed and replaced with saline at UFA Station 114 in Draper. Com., ¶ 58.  As a result of the complaint, UFA and Unified Police conducted an audit of the other firehouses in the area. See Detective James Woods Report at p. 3. [3]  Neither station where Pyle was assigned had anything missing.

On April 23, 2013 Chief Russo of Cottonwood Heights Police department assigned Detective Woods to investigate and provided Woods a list containing the names and dates of birth of all 480 firefighters employed by UFA. Com., ¶ 60. Detective Woods accessed the UCSD for 480 UFA employees. Woods did not suspect Pyle of any criminal activity. Com., ¶ 63. He searched the database to  "develop suspect leads". Com., ¶ 64.

Cottonwood Heights Mayor Kelvyn Cullimore ("Cullimore") acted as both the mayor of Cottonwood Heights and a member of the UFA Board, the local government board that oversees all of the activities of the UFA. Com ¶¶ 32-36.

Upon information and belief, Cullimore directed and approved the actions of the City's Chief of Police Russo and Detective Woods regarding this investigation. Com., ¶¶

---

[2] UFA is the largest fire department in the State of Utah. See http://www.unifiedfire.org.
[3] See Woods Report attached as Exhibit A. If the Court determines that there are not sufficient facts alleged, Plaintiff requests leave to amend under Rule 15, F.R.C.P., to alleged the additional facts from sources such as this report.

93-101. He was also provided specific medical information about all 480 individuals who had their information searched. Com., ¶ 80.

Detective Woods pulled the prescription records from the UCSD for all 480 UFA employees. Based on the review of the 480 firefighters' medical histories, Detective Woods suspected 4 individuals of being opioid dependent based on the UCSD medical information he searched.  Pyle was one of the four. Com., ¶ 64-65.

On May 9, 2013, Woods contacted and met with Pyle's medical providers. Com., ¶ 74.  Pyle was unaware of the investigation and never gave his consent to anyone to review his medical records. Com., ¶¶ 75-77. Woods did not have a warrant to review his medical records or any reasonable belief that Pyle had committed any crime to review Pyle's medical records.  Com., ¶ 63, 78-79.

On May 9, 2013, Woods also called Pyle in for questioning.  See Woods Rep, p. 7. Woods explained that Pyle's personal prescription drug records had been pulled from the UCSD and as a result, he was under a "criminal investigation."  See Woods Rep, p. 7. Pyle ended the discussion with Woods immediately.  See Woods Rep, p. 7.

On June 17, 2013, the Salt Lake County District Attorney's office declined to pursue criminal charges against Pyle. Com., ¶¶ 82-83. On July 10, 2013 Detective Woods took the case to the Utah Attorney General who, in October of 2013, charged Mr. Pyle with eight felony counts of prescription drug fraud. Shortly thereafter, the UFA suspended Pyle from his job with pay. Com., ¶¶  84-86; Woods Rep, p. 15.

Mr. Pyle alleges these facts establish that defendant Detective Woods, acting as a Police Officer employed by the City of Cottonwood Heights, under the direction of Mayor Cullimore, violated his State and U.S. Constitution Rights as well as the statutory protections of Utah Code §§ 63G-2-202, 206, and 302 by accessing and disclosing his

private medical histories and the other 479 individuals without reasonable suspicion of criminal conduct by Plaintiff or the other 479 employees, their consent, or pursuant to a search warrant. Complaint, ¶¶ 93-101.

Pyle also alleges that in the months of April through November of 2013, defendant Cullimore as the Mayor of Cottonwood Heights, violated Plaintiff's State and U.S. Constitution Rights as well as the statutory protections of Utah Code §§ 63G-2-202, 206, and 302 by accessing and disclosing his private medical history and the private medical histories of the 479 other individuals. Com, ¶¶ 80, 84.

Pyle also alleges that defendant Cottonwood Height violated his Constitutional and Statutory Rights through the actions of its policy makers, Mayor Cullimore and Chief Russo, by initiating and implementing policy and procedures that disregard Pyle's right to privacy under Utah Code §§ 63G-2-202, 206, and 302, the Utah and U.S. Constitution and well settled jurisprudence. Complaint, ¶¶ 93-101.

Plaintiff also alleges that each of the defendants violated his rights under the Fair Credit Reporting Act, by failing to follow the statutory requirements for obtaining and using private medical records from the UCSD for employment purposes.  Complaint, ¶ 91.

### III. SUMMARY OF ARGUMENT

If Utah Code § 58-37f-201 allows government agents to obtain confidential and sensitive medical records in criminal investigations without a warrant or even reasonable suspicion of a crime then it does not comply with the U.S. and Utah Constitutions and other federal and state laws limiting access to and dissemination of

private information. Plaintiff contends that the Defendants violated the 1st, 4th and 14th Amendments to the U.S. Constitution. [4]

Defendants argue that individuals such as plaintiff, do not have a protected right to privacy regarding the information contained in the UCSD.  As will be shown, Defendants argument stems from their belief that accessibility overrides the various protections afforded to private medical records.

Defendants Cullimore and Woods also argue that even if Plaintiff is correct, and the defendants cannot access the database without violating statutory and constitutional provisions, defendants Cullimore and Woods should be afforded qualified immunity. They claim they did not know their actions violated statutory and constitutional rights.

Plaintiff takes the opposite position in both instances.  Both the U.S. Constitution and the Utah Constitution protect our right to privacy of our medical records even if that information is gathered and maintained in a government database.  Additionally, federal and state law defines the protection citizens can expect regarding this private information.

Since this information is in fact private and protected, Plaintiff turns his response to the Defendant's second argument where they contend that the protections were not obvious or known to Defendants.

This is a hollow argument inasmuch as defense wants the court to believe that because they had a key to the UCSD, they were authorized to enter without limitation. Any police officer who approaches the front door of a residence knows full well that even

---

[4] Plaintiff has also alleged Defendants violated the Utah Constitution. Defendants do not contest this in their motion but only ask that the Court to remand those claims to state court. Therefore, the Plaintiff will not address his Utah constitutional claims since they are not contested.

if the door is standing open he cannot enter as a police officer without a warrant, exigent circumstances, or consent.

Last, the Defendants claim they cannot be held liable under the FCRA since it was part of an employment investigation. Plaintiff contends that a mass investigation with no reasonable suspicion as to any person does not qualify under the FCRA's limited exception. And, in any event, the Defendants do not qualify for the exception since they failed to comply with the exception's requirements.

## IV. ARGUMENT

### A.   STANDARD OF REVIEW - MOTION TO DISMISS

In *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008), the court addressed the standard for a motion to dismiss on the basis of qualified immunity in the context of a civil rights action. The Court held that:

> To "nudge their claims across the line from conceivable to plausible," *Twombly*, 127 S.Ct. at 1974, in this context, plaintiffs must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time. This requires enough allegations to give the defendants notice of the theory under which their claim is made.

> This does not mean that complaints in cases subject to qualified immunity defenses must include "all the factual allegations necessary to sustain a conclusion that defendant violated clearly established law." *Breidenbach v. Bolish,* 126 F.3d 1288, 1293 (10th Cir.1997). In *Currier* we found this heightened pleading standard superceded by the Court's decision in *Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). *Currier v. Doran,* 242 F.3d 905,  916 (10th Cir.2001). *Twombly,* too, rejects a heightened pleading standard. 127 S.Ct. at 1973–74.

> However, the complaint must meet the minimal standard of notice pleading as articulated by the Court in *Twombly*. Although we apply "the same standard in evaluating dismissals in qualified immunity cases as to dismissals generally," *Shero v. City of Grove, Okl.,* 510 F.3d 1196, 1200 (10th Cir.2007), complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants. The *Twombly* standard may have greater bite in

such contexts, appropriately reflecting the special interest in resolving the affirmative defense of qualified immunity "at the earliest possible stage of a litigation."[2] *Anderson,* 483 U.S. at 646 n. 6, 107 S.Ct. 3034; *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. Without allegations sufficient to make clear the "grounds" on which the plaintiff is entitled to relief, *Twombly,* 127 S.Ct. at 1965 n. 3, it would be impossible for the court to perform its function of determining, at an early stage in the litigation, whether the asserted claim is clearly established.

In this matter, Plaintiff has asserted specific facts related to specific defendants, alleging conduct that on it's face violates both the Constitutions of the United States and the State of Utah, as well as specific statutory violations.  These statutory violations provide a basis for the conclusion that Defendants knew or should have known the conduct complained of was prohibited.

The Plaintiff has raised a number of constitutional violations under the 1st, 4th, 5th and 14th Amendments. Proof of anyone of these supports Plaintiff's claims under 42 U.S.C. § 1983. Plaintiff is proceeding under the 4th Amendment claim and will abandon claims under the remaining Amendments.

The standards applicable to a motion to dismiss for failure to state a claim under Rule 12(b)(6) are clearly set out in the 10th Circuit by *Southern Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1152 (C.A.10 (Utah),2013) and they are

courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). "We also must construe the statements made in the affidavits in the light most favorable to the petitioner." *Initiative & Referendum Inst. v. Walker,* 450 F.3d 1082, 1089 (10th Cir.2006) (en banc) (internal quotation marks omitted). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' " *Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. 2130 (quoting *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)) (alteration in original);

This closely follows the holding in *Ashcroft v. Iqbal,* which is the primary case Defendants cite for the opposite conclusion.  In *Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)* the United States Supreme Court stated;

> A claim has facial plausibility when pleaded factual content allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged."

The Plaintiff's well plead complaint establishes that his claims against the Defendants are easily plausible. In consideration of the ruling in both the *Southern Utah Wilderness Alliance v. Palma* case as well as the *Ashcroft v. Iqbal* matter it is clear that this motion should be denied.

Alternatively, if the Court finds that the plaintiff's pleading in a § 1983 action is deficient, "courts [generally] grant a plaintiff leave to amend the complaint to allege more specific facts rather than dismiss the cause of action." *LaFleur v. Wallace State Cmty. Coli.*, 955 F. Supp. 1406, 1421 (M.D. Ala. 1996).

## B. DEFENDANTS VIOLATED MR. PYLE'S FOURTH AMENDMENT RIGHTS BY ACCESSING HIS SENSITIVE AND CONFIDENTIAL MEDICAL RECORDS WITHOUT A WARRANT.

### 1. MR. PYLE HAS A REASONABLE EXPECTATION OF PRIVACY IN HIS CONFIDENTIAL MEDICAL RECORDS HELD IN THE UCSD

Under the Fourth Amendment, law enforcement must obtain a probable cause warrant from a neutral magistrate when the target of the investigation has a reasonable expectation of privacy in the item or location searched. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). As the Supreme Court has repeatedly explained, "'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *City of Los Angeles v. Patel*, ___ S. Ct. ___, 2015 WL

2473445, at *7 (June 22, 2015) (quoting *Gant*, 556 U.S. at 338)). Because Plaintiff has a reasonable expectation of privacy in his prescription records contained in the UCSD and the confidential medical information those records reveal, Defendants violated his Fourth Amendment rights by seizing and searching the records without a warrant.

Warrantless access to confidential medical records infringes on privacy expectations recognized by case law, states' practices, and longstanding principles of medical ethics known to the Fourth Amendment's framers and relied on by the public today. These sources provide redundant support for the same basic proposition, that society has reached near consensus about the need to maintain the privacy of medical and prescription records. The Pew Research Center recently found, people consider information about the "state of their health and *the medicines they take*" to be among the most private pieces of information about them, deeming it more sensitive than the contents of their emails or text messages, their relationship history, or their religious views.[5]

In *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), the Supreme Court held that patients have a reasonable expectation of privacy in their medical records. The case addressed whether the "special needs" exception to the Fourth Amendment's warrant requirement provides a state hospital with "authority to conduct drug tests [of patients] and to turn the results over to law enforcement agents without the knowledge or consent of the patients." *Id.* at 77. Before concluding that the special needs exception did not

---

[5] Pew Research Center, *Public Perceptions of Privacy and Security in the Post-Snowden Era* 32 (Nov. 12, 2014),
http://www.pewinternet.org/files/2014/11/PI_PublicPerceptionsofPrivacy_111214.pdf
81 % of respondents considered information about health and medications to be "sensitive." *Id.*

apply—and the hospital had violated the Fourth Amendment—the Court held that "[t]he reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent." *Id.* at 78.

Although the Court did not address prescription records in particular, its reasoning in *Ferguson* applies with equal force to medical records beyond diagnostic test results, including confidential prescription information that can reveal just as much about an underlying diagnosis as the test results themselves.

Following the holding of *Ferguson*, a recent opinion from the U.S District Court for the District of Oregon explains why the Fourth Amendment's warrant requirement applies to prescription records held in a state's controlled substance database:

> the court easily concludes that [patients'] subjective expectation of privacy in their prescription information is objectively reasonable. Although there is not an absolute right to privacy in prescription information, as patients must expect that physicians, pharmacists, and other medical personnel can and must access their records, it is more than reasonable for patients to believe that law enforcement agencies will not have unfettered access to their records. The prescription information maintained by [the Oregon Prescription Drug Monitoring Program] is intensely private as it connects a person's identifying information with the prescription drugs they use.

*Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Admin.* ("*Oregon PDMP*"), 998 F. Supp. 2d 957, 966 (D. Or. 2014) (footnote omitted); *see also id.* at 965 (citing *Ferguson*).

That conclusion has ample support in the Tenth Circuit. In *Douglas v. Dobbs*, 419 F.3d 1097, 1102 (10th Cir. 2005), the court opined that

> we have no difficulty concluding that protection of a right to privacy in a person's prescription drug records, which contain intimate facts of a personal nature, is sufficiently similar to other areas already protected within the ambit of privacy. Information contained in prescription records

. . . may reveal other facts about what illnesses a person has . . . . Thus, it
seems clear that privacy in prescription records falls within a protected
"zone of privacy" . . . .

*Id.* at 1102 (citations omitted); *accord Doe v. Se. Pa. Transp. Auth.*, 72 F.3d 1133, 1138

(3d Cir. 1995) ("An individual using prescription drugs has a right to expect that such

information will customarily remain private.").

Although *Douglas* was decided under the right to informational privacy protected

by the Fourteenth Amendment due process clause, its recognition of a strong privacy

interest in prescription records provides one source for the societal expectation of

privacy in prescription records and the medical information they reveal, and thus a basis

for triggering the Fourth Amendment's protections. Because "few subject areas [are]

more personal and more likely to implicate privacy interests than that of one's health,"

*Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1269 (9th Cir. 1998),

patients have a reasonable expectation of privacy in their medical information.[6] The

Supreme Court has recognized as much, *Ferguson*, 532 U.S. at 78, as has the Tenth

Circuit. *F.E.R. v. Valdez*, 58 F.3d 1530, 1535 (10th Cir. 1995) (noting that the patient-

plaintiffs "had an expectation of privacy in their medical records" and upholding search

because it was pursuant to a facially valid warrant).  Other courts agree. *See, e.g.*,

*Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 550 (9th Cir. 2004) ( "[Under the Fourth

---

[6] Prescription records reveal some information (the drugs and dosages a person takes) directly
and other information (a patient's underlying medical conditions) by inference. A search can
implicate the Fourth Amendment regardless of whether it reveals information directly or through
inference. *See Kyllo v. United States*, 533 U.S. 27, 36 (2001) (rejecting "the novel proposition
that inference insulates a search," noting that it was "blatantly contrary" to the Court's holding in
*United States v. Karo*, 468 U.S. 705 (1984), "where the police 'inferred' from the activation of a
beeper that a certain can of ether was in the home"). See
https://archive.org/stream/63310410R.nlm.nih.gov/63310410R_djvu.txt

14

Amendment,] all provision of medical services in private physicians' offices carries with it a high expectation of privacy for both physician and patient."); *State v. Skinner*, 10 So. 3d 1212, 1218 (La. 2009) ("[W]e find that the right to privacy in one's medical and prescription records is an expectation of privacy that society is prepared to recognize as reasonable."); *Doe v. Broderick*, 225 F.3d 440, 450–51 (4th Cir. 2000) ("[A] patient's expectation of privacy . . . in his treatment records and files maintained by a substance abuse treatment center is one that society is willing to recognize as objectively reasonable.").

In *Valdez*, the state agents had obtained a warrant before searching the Plaintiffs medical records.  Even with a warrant, the Court analyzed whether the Plaintiffs could establish a 1983 claim based on the agents accessing private medical records. Ultimately, the Court found the records were private but held the Plaintiffs claim failed because they could not show a less intrusive procedure.

It is no surprise that the Supreme Court in *Ferguson*, the 10th Circuit and other courts have so easily concluded that people have a reasonable expectation of privacy in their medical records. The confidentiality of patient medical information has been established since the 4th Century B.C. The Oath of Hippocrates, required physicians to maintain patient secrets: "Whatever I see or hear in the lives of my patients, whether in connection with my professional practice or not, which ought not to be spoken of outside, I will keep secret, as considering all such things to be private." [7]

In American medical practice, a requirement to preserve the confidentiality of patient health information was included in the earliest code of ethics of the American

---

[7] See National Institutes of Health at https://www.nlm.nih.gov/hmd/greek/greek_oath.html

Medical Association in 1847 and every subsequent edition of that code. [8]  Today,
virtually all patients (97.2%) believe that health care providers have a "legal and ethical
responsibility to protect patients' medical records."[9]    Accordingly, 93% of patients
want to decide which government agencies can access their electronic health records,[10]
and 88% oppose letting police see their medical records without permission.[11]

 "In evaluating the reasonableness of police procedures under the Fourth
Amendment," the Supreme Court has often "looked to prevailing rules in individual
jurisdictions" and the trend in relevant state laws. *Tennessee v. Garner*, 471 U.S. 1, 15–
16, 18 & n.21 (1985) (citation omitted); *see also Elkins v. United States*, 364 U.S. 206,
219 (1960).[12] In Utah, medical records are deemed private records. Utah Code § 63G-2-
302(1)(b).  Private records are protected from disclosure by Utah Code § 63G-2-202.[13]

---

[8] The 1847 code provided: "The obligation of secrecy extends beyond the period of professional services ; — none of the privacies of personal and domestic life, no infirmity of disposition or flaw of character observed during professional attendance, should ever be divulged by him except when he is imperatively required to do so. The force and necessity of this obligation are indeed so great, that professional men have, under certain circumstances, been protected in their observance of secrecy by courts of justice."

[9] New London Consulting & Fair Warning, *How Privacy Considerations Drive Patient Decisions and Impact Patient Care Outcomes* 10 (Sept. 13, 2011), http://www.fairwarning.com/whitepapers/2011-09-WP-US-PATIENT-SURVEY.pdf (I-ER 158).

[10] Patient Privacy Rights & Zogby International, *2000 Adults' Views on Privacy, Access to Health Information, and Health Information Technology* 4 (2010), http://patientprivacyrights.org/wp-content/uploads/2010/11/Zogby-Result-Illustrations.pdf (I-ER 168).

[11] Institute for Health Freedom & Gallup Organization, *Public Attitudes Toward Medical Privacy* 9–10 (Sept. 26, 2000), http://www.forhealthfreedom.org/Gallupsurvey/IHF-Gallup.pdf (I-ER 183–84).

[12] Fourth Amendment rules are not determined by state law, *Virginia v. Moore*, 553 U.S. 164 (2008), but *Garner* illustrates how the Court's assessment of Fourth Amendment standards can be informed by relevant state practices.

[13]  Utah Code § 63G-2-202 only allows the records to be disclosed if (1) the person seeking the record has power of attorney from the subject of the record; (2) the person seeking the record "submits a notarized release from the subject of the record or the individuals legal representative

And a number of state legislatures have enacted legislation prohibiting law enforcement from accessing records in those states prescription monitoring programs unless the government gets a warrant or otherwise demonstrates probable cause. *See* Ala. Code § 20-2-214(7); Alaska Stat. § 17.30.200(d)(5); Ark. Code Ann. § 20-7-606(b)(2)(A); Ga. Code Ann. § 16-13-60(c)(3); Iowa Code § 124.553(1)(c); Minn. Stat. § 152.126(6)(b)(7); Mont. Code Ann. §§ 37-7-1506(1)(e), 46-4-301(3); N.H. Rev. Stat. Ann. § 318-B:35(I)(b)(3); Or. Rev. Stat. § 431.966(2)(a)(C); R.I. Gen. Laws § 21-28-3.32(a)(3); *see also* Vt. Stat. Ann. tit. 18, § 4284 (barring access to prescription database records by law enforcement directly or on request). Utah enacted the same protections in the 2015 legislative session. Utah Code Ann. § 58-37f-301(2)(k).

Records in the UCSD can indicate facts about patients' sex, sexuality, and sexually transmitted infections, mental health, and substance abuse. These areas "are highly sensitive, even relative to other medical information." *Norman-Bloodsaw*, 135 F.3d at 1269. Knowing a treatment can reveal a patient has AIDS, *Doe,* 15 F.3d at 267; or mental illnesses that deserve confidentiality. *See Jaffee v. Redmond*, 518 U.S. 1, 10 (1996); or substance abuse addiction and treatment that deserve confidentiality. 42 U.S.C. § 290dd-2; *see also Broderick*, 225 F.3d at 450–51. The expectation of privacy in prescription records and the medical information they reveal is recognized by society as reasonable.

---

dated no more than 90 days before the date the request is made; or (3) if the record is a medical record described in subsection 63G-2-302(1)(b) is a health care provider, as defined in § 26-33A-102, if releasing the record or information in the record is consistent with normal professional practice and medical ethics; or (e) any person to whom the medical record must be provided pursuant to: (i) a court order as provided in Subsection 7; or (ii) a legislative subpoena as Disclosure or disclose means the communication of heath care data to any individual or organization outside the committee, its staff, and contracting agencies.

As noted above, the federal decision in *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Admin.* ("*Oregon PDMP*"), 998 F. Supp. 2d 957, 963-67 (D. Or. 2014) supports the Plaintiff's position before this court.  The state cases cited by Defendants do not lead to a contrary conclusion.

Defendants cite *Williams v. Commonwealth,* 213 SW.2d 682 (Ky. 2007), for the position that a warrantless access by law enforcement to the Kentucky prescription drug database "does not constitute a 'search' under the Fourth Amendment or [the Kentucky Constitution] since citizens have no reasonable expectation of privacy in this limited examination of and access to their prescription records.  *See* Defendants' MTD P. 13.

We are not in Kentucky. And, this citation to Kentucky case law is incomplete. After the Kentucky Supreme Court decided Williams v. Commonwealth, the Kentucky Court of Appeals (the state intermediate appellate court) decided Carter v. Commonwealth, 358 S.W.3d4 (Ky. Ct. App. 2011).  Carter holds that in light of the serious privacy concerns raised by law enforcement access to sensitive prescription records, law enforcement must have reasonable suspicion to request records from the Kentucky prescription drug monitoring database.  Thus, even under Kentucky case law, Defendants search of the Plaintiffs medical records violates the Fourth Amendment since they lacked any suspicion, reasonable or otherwise. Com, ¶ 63.

The other state court decisions to which Defendants cite are inapposite. With the exception of *Williams v. Commonwealth*, none of the state cases identified by Defendants concern access to state prescription monitoring programs. *See* Defendants' MTD pp. 14-17, 21-22. Instead, those cases address the question whether law enforcement can conduct an inspection of an *individual* pharmacy's records without a

probable cause warrant. The question whether the administrative-search or closely-regulated-industry exceptions to the warrant requirement allow warrantless search of a particular pharmacy is not at issue in this case.

Rather, here Defendants conducted an instantaneous search of the controlled substance prescription records of *every* pharmacy in the state with the click of a button. As the district court in Oregon put it, "[w]hether or not such requests  [to individual pharmacies] would conform with the Fourth Amendment is not before the court and [law enforcement's] ability to obtain limited prescription information in a more cumbersome manner is irrelevant to this court's analysis." *Oregon PDMP*, 998 F. Supp. 2d at 966 n.4.[14]

The defendants' use of *Whalen v. Roe*, 429 U.S. 589 (1977), is similarly misleading. *Whalen* did not address the question whether the Fourth Amendment requires a warrant for law enforcement access to a state prescription monitoring program database. Rather, the question presented there was whether a state's creation of such a database violates the right to informational privacy under the Fourteenth Amendment due process clause. *Whalen* does not support warrantless access to a prescription drug database under the Fourth Amendment. The Court explicitly avoided deciding that question, because the facts of the case did not "involve affirmative, unannounced, narrowly focused intrusions into individual privacy during the course of criminal investigations." *Id*. at 604 n.32. The facts of Pyle's case do, of course, involve

---

[14] Even outside of the prescription monitoring database context, state courts are divided on whether law enforcement may access prescription records without a warrant. *See State v. Skinner*, 10 So. 3d 1212, 1218 (La. 2009) (holding that there is a reasonable expectation of privacy in prescription records and requiring a warrant for law enforcement access to them).

such intrusions, and so the Fourth Amendment is relevant. *Whalen* simply does not

decide the Fourth Amendment question.

>    2.    THE THIRD PARTY DOCTRINE DOES NOT DEFEAT
>          CONFIDENTIALITY

The fact that Defendants accessed Plaintiffs' confidential prescription records

from a secure state database rather than from Mr. Pyle's own home does not vitiate the

reasonable expectation of privacy in the records. The so-called "third-party doctrine" as

set out in Supreme Court cases from the 1970s does not apply. *See United States v.*

*Miller*, 425 U.S. 435 (1976) (no expectation of privacy in bank records shared with the

bank); *Smith v. Maryland*, 442 U.S. 735 (1979) (same for telephone numbers a person

dials). As the district court in Oregon explained:

> this case is markedly different from *Miller* and *Smith* for two reasons. The
> first is that the [Prescription Drug Monitoring Program's] records are
> "more inherently personal or private than bank records," and are entitled
> to and treated with a heightened expectation of privacy. *See, DeMassa v.*
> *Nunez*, 770 F.2d 1505 (9th Cir.1985) (attorney's clients have reasonable
> expectation of privacy in their legal files even though kept and maintained
> by attorney). Secondly, patients and doctors are not voluntarily conveying
> information to the PDMP. The submission of prescription information to
> the PDMP is required by law. The only way to avoid submission of
> prescription information to the PDMP is to forgo medical treatment or to
> leave the state, This is not a meaningful choice.

*Oregon PDMP*, 998 F. Supp. 2d at 967 (citation omitted).

The Sixth Circuit's opinion in *United States v. Warshak*, 631 F.3d 266 (2010), is

instructive. The court held there is a reasonable expectation of privacy in the contents of

emails held in an email provider's servers. The fact that email is sent through an internet

service provider's servers does not vitiate the legitimate interest in email privacy similar

to letters and phone calls sent via third parties (the postal service and phone

companies), but people retain a reasonable expectation of privacy in those forms of

communication. *Id.* at 285–86 (citing *Katz v. United States*, 389 U.S. 347, 353 (1967); *United States v. Jacobsen*, 466 U.S. 109, 114 (1984)).

Under the Fourth Amendment, access to a protected area for one limited purpose does not render that area suddenly unprotected from government searches. *See, e.g.*, *Minnesota v. Olson*, 495 U.S. 91, 98–99 (1990) ("an overnight guest has a legitimate expectation of privacy in his host's home" even though "he and his possessions will not be disturbed by anyone *but his host and those his host allows inside*" (emphasis added)); *Stoner v. California*, 376 U.S. 483, 487–90 (1964) (implicit consent to janitorial personnel to enter motel room does not amount to consent for police to search room); *Chapman v. United States*, 365 U.S. 610, 616–17 (1961) (search of a house invaded tenant's Fourth Amendment rights even though landlord had authority to enter house for some purposes); *State v. Kent*, 432 P.2d 64, 66 (Utah 1967) ("[T]he consent of a landlord or hotel or motel manager would not be sufficient to justify an officer to make a search of tenant's premises without a warrant.").

Prescription records stored in the UCSD are analogous to emails stored in servers. The entity maintaining the e-mails may only access them for limited enumerated purposes. Compare *Warshak*, 631 F.3d at 287 (the email provider's terms of service permitted it to "'access and use individual Subscriber information in the operation of the Service and as necessary to protect the Service'"), *with* Utah Code § 58-37f-301(2) (explaining limited circumstances under which Division of Occupational and Professional Licensing employees may access UCSD) and § 58-37f-601 (imposing criminal penalties for unauthorized access to and use of UCSD records). More importantly, both sets of records are deeply private. *See Warshak*, 631 F.3d at 284 ("an email account . . . provides an account of its owner's life. By obtaining access to

someone's email, government agents gain the ability to peer deeply into his activities."),
with

Searching massive computerized files raises particular concerns. *See United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1175–77 (9th Cir. 2010); *United States v. Carey*, 172 F.3d 1268, 1275 (10th Cir. 1999). Prior to creation of the UCSD, individuals could rely on the practical realities of law enforcement's limited resources to protect them from sweeping, dragnet searches. *United States v. Jones*, 132 S. Ct. 945, 963–64 (2012) (Alito, J., concurring in judgment). To obtain a person's prescription records, law enforcement had to canvass numerous pharmacies or physicians for records, a resource-intensive exercise only justified in important or well-founded cases. Now, however, the government can obtain an entire transcript of a person's—or 480 persons'—out-patient prescription history for controlled substances from a single computer in a few minutes. For these reasons the so-called "third party doctrine" does not preclude relief under the Fourth Amendment here.

## C.  DEFENDANTS WOODS AND CULLIMORE DO NOT HAVE QUALIFIED IMMUNITY.

1.     THE STANDARD FOR QUALIFIED IMMUNITY.

The standard for determining whether or not a public official is entitled to qualified immunity is set forth in the 10th Circuit in *Kerns v. Bader,* 663 F.3d 1173 (10th Cir. 2011).

In *Kerns,* the 10th Circuit recognized that;

Law enforcement officers are, of course, entitled to a presumption that they are immune from lawsuits seeking damages for conduct they undertook in the course of performing their jobs. "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." (citation omitted)

The Court in *Kerns* continued however, and recognized that a Plaintiff may overcome a claim of qualified immunity:

> A plaintiff can overcome this presumption of immunity only by carrying the heavy burden of showing both that (1) the defendant-officer in question violated one of his constitutional rights, and (2) the infringed right at issue was clearly established at the time of the allegedly unlawful activity such that "every reasonable official would have understood that what he [was] doing" violated the law. (citation omitted) Failure on either qualified immunity element is fatal to the plaintiff's cause.

For purposes of the qualified immunity defenses, the Defendants do not appear to contest the first prong of this test, i.e., that Plaintiff's constitutional rights were violated. The Defendants focus on the second prong of the test: whether the infringed right was clearly established at the time of the unlawful activity.

### 2.   THERE IS NO QUALIFIED IMMUNITY FOR COTTONWOOD HEIGHTS

The City does not have immunity, qualified or otherwise. *Owen v. City of Independence, Mo*., 445 U.S. 622, 652, 100 S. Ct. 1398, 63 L. Ed. 2d 673 (1980).  In *Owen*, the Supreme Court held that while individual officers and municipal officials may have "qualified immunity," municipalities themselves do not.  Id.  The Owen Court made their policy considerations clear:

> [T]he threat of liability against the city ought to increase the attentiveness with which officials at the higher levels of government supervise the conduct of their subordinates. The need to institute system-wide measures in order to increase the vigilance with which otherwise indifferent municipal officials protect citizens' constitutional rights is, of course, particularly acute where the front-line officers are judgment-proof in their individual capacities.

445 U.S. at 652 n.36. Myers v. Oklahoma County Bd. of County Com'rs, 151 F.3d 1313, 1317–18 (10th Cir. 1998).

3.      EVERY REASONABLE OFFICIAL UNDERSTOOD THAT THEY COULD NOT OBTAIN PRIVATE MEDICAL RECORDS WITHOUT A WARRANT OR LEGAL PROCESS IN 2013.

In *Kerns v. Bd. of Comm'rs*, 707 F. Supp. 2d at 1263-1264, the Court noted:

The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that '[t]he easiest cases don't even arise.'" Safford Unified Sch. Dist. # 1 v. Redding, 129 S. Ct. 2633, 2643, 174 L. Ed. 2d 354 (2009) [1264]  (quoting K.H. v. Morgan, 914 F.2d 846, 851 (7th Cir. 1990)). The Supreme Court notes, however, that even as to actions less than outrageous, "officials can still be on notice that their conduct violates established law . . . in novel factual circumstances." (citation omitted)

To prevail in their position, the Defendants have to convince this Court that they did not think they had to employ any type of legal process or warrant to obtain access to the private medical records of Plaintiff and 479 others. These are medical records that are protected from disclosure by a constitutional right to privacy. *Douglas v. Dobbs*, 419 F.3d 1097, 1102 (10th Cir. 2005). See also *Ferguson v. City of Charleston*, 532 U.S. 67 (2001).

There is not a person who has dealt with any type of medical provider in the decade since the 10th Circuit statements in *Dobbs* that can legitimately say they are not aware of the privacy attached to medical records under HIPAA. HIPAA makes clear that someone wanting to review medical records must go through legal process to gain access. See 45 C.F.R. § 164.512 (f).

The *Whalen* case cited by the Defendants noted that the New York law only allowed disclosures from the database "pursuant to judicial subpoena or court order in a criminal investigation or proceeding." See *Whalen* at FN 12.

In *F.E.R. v. Valdez*, 58 F.3d 1530, 1534-1535 (10 Cir. 1995) the Court held:

[t]here is a constitutional right to privacy in preventing disclosure by the government of personal matters. *See Whalen v. Roe,* 429 U.S. 589, 599 & n. 24,

97 S.Ct. 869, 876–77 n. 24, 51 L.Ed.2d 64 (1977)." *** [and] "[t]he Constitution generally requires government officials to obtain a search warrant from an impartial judicial official based upon probable cause before seizing material. *Katz v. United States,* 389 U.S. 347, 357, (1967)."

Here, Woods and others knew that he was obtaining the private records of Pyle and 479 others without any warrant or any legal process. Woods also knew that he lacked any probable cause – he did not have any suspicion at all. Com. ¶ 63.

Utah law in May, 2013 also set forth limits on access and dissemination of "private" and "controlled" records.  Utah Code § 63G-2-202, 206 and 302. And, these same records are subject to limits on disclosure under the FCRA, 15 U.S.C.A. § 1681 et seq.

Plaintiff has sufficiently alleged a violation of his Constitutional and Statutory rights that were clearly established at all times relevant to this action.  Further, the Defendants knew that it could not lawfully access private records without a warrant or other legal process. Therefore, the Defendant's contention that they are entitled to qualified immunity fails.

### D.   PYLE HAS STATED A CLAIM FOR VIOLATION OF THE FAIR CREDIT REPORTING ACT.

To recover under the FCRA, Plaintiff must show that some provision of the Fair Credit Reporting Act was violated either negligently or willfully. See 15 U.S.C.A. § 1681o and § 1681n. Plaintiff has alleged that the FCRA was violated because the Defendants did not have a permissible purpose in obtaining the Plaintiff's information for use in connection with his employment. See Complaint at ¶¶ 41-45.

The Defendant claims that it obtained the information as part of an investigation under 15 U.S.C. § 1681a (y). The Defendant's factual allegations as to why it obtained the information cannot be decided on a motion to dismiss. There are issues as to whether

the Defendants' investigation qualifies under this limited exception. This limited exception cannot be blown up to allow an employer to investigate all of its 480 employees when it has no reasonable suspicion as to any particular employee. The Defendants' ignore that the limited exception only applies if there is "suspected misconduct relating to employment". See 15 U.S.C.A. § 1681a (y)(1)(B)(i). Yet, the Defendant has already admitted in its answer that it did not have any reasonable suspicion that Plaintiff did anything wrong. Plaintiff alleges in ¶ 63 of his complaint:

Prior to obtaining the list of employees Detective Woods did not specifically suspect Pyle or any other specific individual on the list of criminal activity. See Com., ¶ 63. The Defendant admitted this fact in its answer. See Defendants' Answer at ¶ 32.

And, the Defendants cannot avail themselves of this exception since it failed to comply with the requirements for the exception. The Defendants argument ignores that if it was proceeding under the limited exception under § 1681a (y), it still had a duty under the FCRA to provide notice to the Plaintiff under § 1681a (y)(2):

**(2) Subsequent disclosure.—** After taking any adverse action based in whole or in part on a communication described in paragraph (1), the employer shall disclose to the consumer a summary containing the nature and substance of the communication upon which the adverse action is based, except that the sources of information acquired solely for use in preparing what would be but for subsection (d)(2)(D) of this section an investigative consumer report need not be disclosed.

The Defendants attempt to find justification for its violations of the FCRA fail. The facts do not support the exception they claim to excuse their wrongful actions.

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be denied.

DATED July 10, 2015.

_____

Tyler Ayres, Attorney for Plaintiff